IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

DANYELLE C. COLLINS,                    :
                                        :
            Plaintiff,                  :
                                        :
      v.                                : Civil Action No. 06-69-JJF
                                        :
                                        :
MICHAEL J. ASTRUE[1],                   :
Commissioner of Social                  :
Security,                               :
                                        :
            Defendant.                  :

---

Gary C. Linarducci, Esquire of THE LAW OFFICE OF GARY LINARDUCCI,
New Castle, Delaware.

Attorney for Plaintiff.

Colm F. Connolly, Esquire, United States Attorney, of the OFFICE
OF THE UNITED STATES ATTORNEY, Wilmington, Delaware.
Donna L. Calvert, Esquire, Regional Chief Counsel, and Patricia
Stewart, Esquire, Assistant Regional Counsel, of the SOCIAL
SECURITY ADMINISTRATION, Philadelphia, Pennsylvania.
David F. Chermol, Esquire, Special Assistant United States
Attorney of the OFFICE OF THE UNITED STATES ATTORNEY,
Philadelphia, Pennsylvania.

Attorneys for Defendant.

---

**MEMORANDUM OPINION**

September ⎭⎭, 2007
Wilmington, Delaware

---

[1]      On February 12, 2007, Michael J. Astrue became the
Commissioner of Social Security.  Accordingly, pursuant to Fed.
R. Civ. P. 25(d)(1), Michael J. Astrue is substituted for the
former Commissioner JoAnne B. Barnhart.

Farnan, District Judge.

     Presently before the Court is an appeal pursuant to 42
U.S.C. §§ 405(g) filed by Plaintiff, Danyelle C. Collins, seeking
review of the final decision of the Commissioner of the Social
Security Administration denying Plaintiff's application for
disability insurance benefits ("DIB") under Title II of the
Social Security Act (the "Act"), 42 U.S.C. §§ 401-433.   Plaintiff
has filed a Motion For Summary Judgment (D.I. 14) requesting the
Court to enter judgment in her favor or remand this matter to the
Commissioner.   In response to Plaintiff's Motion, Defendant has
filed a Cross-Motion For Summary Judgment (D.I. 16) requesting
the Court to affirm the Commissioner's decision.   For the reasons
set forth below, Defendant's Motion For Summary Judgment will be
denied, and Plaintiff's Motion For Summary Judgment will be
granted.   The decision of the Commissioner dated April 15, 2004,
will be affirmed.

                            **BACKGROUND**

**I.   Procedural Background**

     Plaintiff filed an application for DIB on January 29, 2002,
alleging disability as of October 17, 2000, from injuries
stemming from a car accident.   (Tr. 42-44, 55.)   Specifically,
Plaintiff has described her injuries as a herniated disc,
tendonitis and cervical lumbar fusion which causes difficulty in
her arms and hands.   (Id.)   Plaintiff's application was denied

                                                              1

initially, and she timely requested a hearing before the A.L.J.[2]
(Id. 33-36).

On March 25, 2004, the A.L.J. held a hearing.  (Id. at 317-
339.)  Plaintiff appeared at the hearing with counsel and
testified on her own behalf.

Following the hearing, the A.L.J. issued a decision dated
April 15, 2004, denying Plaintiff's claim.  (Id. at 15-27.)
Thereafter, Plaintiff requested review by the Appeals Council,
and her attorney submitted a brief on her behalf.  (Id. at 12,
294-314.)  After considering the additional submission from
Plaintiff's counsel along with the record evidence, the Appeals
Council denied review.  (Id. at 6-9).  Accordingly, the A.L.J.'s
decision became the final decision of the Commissioner.  Sims v.
Apfel, 530 U.S. 103, 107 (2000).

After completing the process of administrative review,
Plaintiff filed the instant civil action pursuant to 42 U.S.C. §
405(g), seeking review of the A.L.J.'s decision denying her claim
for DIB.  In response to the Complaint, Defendant filed an Answer
(D.I. 10) and the Transcript (D.I. 12) of the proceedings at the
administrative level.

---

[2]    Plaintiff's case was randomly selected to be part of a
test program pertaining to simplified administrative appeals.
Thus, Plaintiff was not required to file for reconsideration
before requesting a hearing, and all of her administrative
remedies have been properly exhausted.  (Tr. 35.)

Thereafter, Plaintiff filed a Motion For Summary Judgment and Opening Brief (D.I. 14, 15) in support of the Motion.  In response, Defendant filed a Cross-Motion For Summary Judgment and a combined Opening and Answering Brief (D.I. 16, 17) requesting the Court to affirm the A.L.J.'s decision.  Plaintiff filed a Reply Brief (D.I. 18), and therefore, this matter is fully briefed and ripe for the Court's review.

## II.  Factual Background

### A.   Plaintiff's Medical History, Condition and Treatment

At the time the A.L.J. issued his decision, Plaintiff was thirty four years old.  (Tr. 42).  Plaintiff has a college degree and past relevant work as a case manager and social worker.  (Id. at 56, 80-82.)

Plaintiff sustained the injuries giving rise to her DIB claim as the result of an automobile accident on October 17, 2000.  (Id. at 146.)  Plaintiff was treated two days later by Walter Schwartz, D.O.  Dr. Schwartz noted a reduced range of motion in Plaintiff's cervical and lumbar spine and spasms.  Dr. Schwartz referred Plaintiff to Bruce H. Grossinger, D.O., a neurologist.  (Id. at 146-147.)

Dr. Grossinger examined Plaintiff on October 13, 2000, and observed point tenderness in the occipital nerves, restricted cervical mobility, a positive Spurling's sign and diminished biceps reflexes.  (Id. at 148-149.)  He opined that she should

3

"remain off work until and unless there is a substantial improvement in her clinical status." (Id. at 149.) Dr. Grossinger also performed an electromyography ("EMG") which was non-localizing for the upper extremities. (Id. at 140.)

A November MRI of Plaintiff's cervical spine showed a C4-5 left paracentral disc herniation with "perhaps" subtle cord impingement. (Id. at 143.) It also showed broad-based disc bulging at C5-6 and C6-7 and significant degenerative disc disease. (Id.) An MRI of Plaintiff's lumbar spine showed mild lumbar scoliosis, and an MRI of her left shoulder showed supra spinous tendonitis with possible superimposed intra-substance tendon tear and a small joint effusion. (Id. at 141-142.)

On November 2, 2000, Plaintiff returned to Dr. Schwartz who noted bilateral muscle spasm, marked invertebral disc space tenderness, multiple trigger points in both trapezius groups and a "very positive" Spurling's sign. (Id. at 150.) Dr. Schwartz opined that Plaintiff was still unable to work. At office visits from November 2000 through April 2001, Dr. Schwartz continued to make similar clinical findings. (Id. at 123-126, 130-139, 144-145.) On May 3, 2001, Dr. Schwartz noted that Plaintiff's activities of daily living were "normal," but that she "cannot work at a computer or at a desk for some time" and "talking on the telephone is problematic." (Id. at 126.) Dr. Schwartz also noted that Plaintiff still experienced significant pain in the

cervical spine, bilateral muscle spasm, invertebral disc space tenderness and a positive Spurling's Sign. (Id.) He opined that her recovery had plateaued as for as physical therapy was concerned and he recommended a home exercise program until further instructions were received from Hagop DerKrikorian, M.D., the physician to whom she was referred for surgical evaluation. (Id.)

On August 29, 2001, Plaintiff underwent back surgery. Specifically, Dr. DerKrikorian performed a two-level anterior cervical fusion with autologous tricortical bone grafts and anterior cervical microdiscectomy. (Id. at 90). An x-ray taken the same day revealed that the overall alignment and positioning was satisfactory. (Id. at 95.)

Plaintiff returned to Dr. DerKrikorian on October 11, 2001, and reported that she was "very much pleased with the outcome of her surgery." (Id. at 114.) Dr. DerKrikorian noted that she had complete resolution of her arm symptoms and that other than some mild neck discomfort, she is basically symptom-free." (Id.) On November 27, 2001, Dr. DerKrikorian noted that Plaintiff "no longer has any neck pain or radiating arm pain," but that she experienced some numbness in her fingers. (Id. at 111.) Dr. DerKrikorian opined that Plaintiff had bilateral carpal tunnel syndrome and could not rule out thoracic outlet syndrome. However, he noted that she recuperated well from the surgery and

that x-rays of her cervical spine showed stable anterior fusion with no active bone disease. (Id.) During this time period, Plaintiff was also referred to Dr. Schwartz for post-operative physical therapy.

During her treatment with Dr. Schwartz, Plaintiff reported pain in her cervical spine on the left radiating into her shoulders. (Id. at 112.) Dr. Schwartz noted that Plaintiff had diminished range of motion and bilateral muscle spasms. (Id. at 112-113.)

On November 29, 2001, Plaintiff underwent a Doppler study and a recheck EMG. Plaintiff reported significant neck pain radiating into her shoulders. Her range of motion continued to be diminished and she had cold hands. Dr. Schwartz noted bilateral muscle spasm, greater on the left than the right, positive Spurling's sign, and weak left hand grip. Her circulation appeared normal. (Id. at 110.)

On January 3, 2002, Plaintiff reported problems with the activities of daily living, including nighttime wakings due to acute pain on the left side of her cervical spine, left shoulder and hand. On physical examination, Dr. Schwartz noted palpatory tenderness on the left side of the neck, weak left hand grip, reduced range of motion of the shoulder, and invertebral disc space tenderness. (Id. at 109).

6

On January 28, 2002, Plaintiff returned to Dr. Grossinger complaining of neck, shoulder and arm problems despite her surgery.  (Id. at 99.)  On examination, Dr. Grossinger noted restricted neck mobility and particular restriction in extension and rotation, as well as weakness in the shoulder girdles and arms, puffiness in the wrists and fingertips and diminished left biceps reflexes.  Dr. Grossinger opined that Plaintiff suffered "serious and permanent injuries" relating to the accident, including cervical herniated disc syndrome, left C5 radiculopathy, as well as tenosynovitis of the upper extremities. He recommended continued therapy and pain management with Dr. Schwartz.

On February 7, 2002, Plaintiff returned to Dr. Schwartz and reported continued significant pain in the cervical spine and left arm.  Plaintiff also reported numbness in the fingers of her left hand and frequent dropping of objects.  On examination, Dr. Schwartz noted marked tenderness in the cervical spine, positive Spurling's sign and weakened hand grip.  He also noted that the arterial Doppler of her upper extremity was within normal limits. (Id. at 107.)

On February 14, 2002, Plaintiff returned to Dr. DerKerkorian reporting that she experienced numbness in her forearm and hand, particularly on the left side.  However, Plaintiff reported that the pain she experienced preoperatively radiating into the left

shoulder and upper arm had since resolved.  Dr. DerKrikorian
noted that EMG and nerve conduction studies performed on
Plaintiff revealed chronic C5 radiculopathy without evidence of
carpal tunnel syndrome.  Dr. DerKrikorian did not offer a
specific diagnosis, but still "suspected" carpal tunnel syndrome
rather then lower cervical radiculopathy.  (Id. at 105.)  On the
same day, Dr. Schwartz wrote a letter to Plaintiff's attorney
opining that she was "totally disabled" since the automobile
accident on October 17, 2000.  (Id. at 106.)

On March 28, 2002, Plaintiff reported to Guy M. Nardella,
Jr., for a consultation.  (Id. at 168-169.)  She reported that
over the past six months, she developed pain and a limited range
of motion in the right wrist.  Dr. Nardella noted that an MRI
revealed a tear of the triangular fibrocartilate complex ("TFCC")
with a ganglion cyst over the border of the ulnar styloid
process.  He noted pain in her shoulders and limited range of
motion.  He prescribed a wrist splint and referred her to a
surgeon for further evaluation of the ligament injury and
appropriate repair or reconstruction, if necessary.

On April 9, 2002, Plaintiff saw Randall W. Culp, M.D. a hand
surgeon, for an initial consultation.  (Id. at 170-172.)  On
physical examination, Dr. Culp noted that Plaintiff had a full
range of motion of the cervical spine, negative Adson's,
Wright's, Roos, Spurling's scapular wing and shrug tests, and

full range of motion of the shoulders without tenderness. Dr.
Culp found that Plaintiff had persistent cervical radiculopathy,
but contrary to Dr. Nardella, found "no evidence of any
tenderness over the ulnar side of the right wrist consistent with
a ganglion cyst or TFCC tear." (Id. at 172.) Dr. Culp
recommended that Plaintiff receive a second opinion for her
cervical spine, but did not see the need for further hand or
upper extremity evaluation.

On September 23, 2003, Dr. Schwartz wrote another letter to
Plaintiff's attorney noting that Plaintiff experienced continued,
ongoing pain which required narcotic drugs. Dr. Schwartz noted
that the pain, combined with Plaintiff's use of pain medication,
"require[d] her to rest an hour or two in the mornings or in the
afternoons," "dull[ed] her senses" and made her unable "to fully
participate in family affairs." (Id. at 264.) Dr. Schwartz also
stated that Plaintiff developed bilateral carpal tunnel syndrome
which caused her wrist pain and made fine movements and hand
grasps difficult. He opined that Plaintiff was severely disabled
and required ongoing medication and rest from the activities of
daily living due to her injuries from the motor vehicle accident,
ongoing pain, the status of her post cervical laminectomy with
fusion, ongoing neuropathy in the left shoulder and arm and
bilateral carpal tunnel syndrome. He opined that Plaintiff was
"totally disabled from performing any substantial gainful

activity," that her "[f]unctional capacity is less than sedentary," and that "[s]he had marked difficulty in performing any of the activities of daily living."  (Id. at 265.)

Plaintiff continued to treat regularly with Dr. Schwartz through December 22, 2003.  During this time, Plaintiff continued on a variety of medications for pain until she became pregnant. She reported her pregnancy to Dr. Schwartz on October 27, 2003. (Id. at 263.)

On February 24, 2004, Dr. Schwartz again wrote to Plaintiff's attorney noting that Plaintiff continued to suffer from severe and persistent pain in the cervical spine radiating into her left shoulder.  He noted "objective evidence on MRI of herniated cervical disc and on EMG of a cervical radiculopathy." (Id. at 260.)  He also indicated that she would resume her pain medications after her pregnancy at which time he hoped to have her undergo a surgical consultation.  Dr. Schwartz also completed a "Clinical Assessment of Pain" for Plaintiff on the same day which indicated that her pain was incapacitating and required medication and/or bed rest.  Dr. Schwartz also wrote that Plaintiff was "restricted from the work place and is unable to function at a productive level."  (Id. at 261.)

2.   State Agency Physician Evaluation

On April 12, 2002, a state agency physician reviewed the medical evidence of record and opined that Plaintiff could

perform light exertional work.  Specifically, he opined that Plaintiff could lift 20 pounds occasionally, 10 pounds frequently, stand and/or walk about 6 hours in an 8 hour day and sit about 6 house in an 8 hour day.  He found no limitations in her ability to push and pull and no postural limitations. According to the state agency physician, there were no treating or examining source statements regarding the Plaintiff's physical capacities in the file.  (Id. at 173-180.)

   B. The A.L.J.'s Decision

   On March, 25, 2004, the A.L.J. conducted a hearing on Plaintiff's application for benefits.  At the hearing, Plaintiff was represented by counsel.  Plaintiff testified that she was unable to be at home alone and that either her husband or a family friend attended to her needs.  Plaintiff testified that she could not climb stairs without assistance, and only uses the stairs once a day to shower.  (Id. at 320.)  She testified that because she cannot climb the stairs she has to sleep on the downstairs sofa.  (Id. at 321-322.)

   Plaintiff testified that her past work was at a foster care agency where she took care of 22 children from birth to age 17. (Id. at 323-326.)  Her work involved lifting children, moving luggage and moving boxes.  She indicated that her job required her to lift an average of twenty-five pounds or more for a total of four or more hours a day, stand five or more hours a day,

11

climb, push and pull.  Prior to her job at the foster care agency, she worked at the Maternity Care Coalition where she was a counselor for pregnant or parenting teens from the age of fourteen to eighteen years old.  She reiterated similar job type requirements for that position, with the added need to climb 60 or 70 steps since the office was on the fourth floor of a building with no elevator.

During the hearing, the A.L.J. noticed that Plaintiff was pregnant and inquired about her use of medications.  (Id. at 326-327.)  Plaintiff testified that she takes Tylenol to take the edge off her pain.  She testified that she used narcotic pain medication prescribed by Dr. Schwartz, but she could not recall the medications she took.  She testified that since her car accident, she experiences forgetfulness, constant and severe pain including burning, radiating stabbing pain in her neck, shoulders and arms, numbness and weakness in her arms and fingers and overall weakness and fatigue.  She testified that she only sleeps two or three hours at a time, and that for the whole night she sleeps three hours because she wakes up constantly due to pain. She further testified that she could only walk a block or two, could only stand for fifteen minutes at a time and could only sit for an hour.  She indicated that she could not do any lifting, bending or climbing and that she experiences difficulty concentrating, remembering and carrying out instructions.

Plaintiff also testified that she lies down for two hours a day due to her constant pain, weakness and fatigue. Plaintiff testified that she does not interact with family and friends, and does not go out of the house except to go to the doctor. (Id. at 329-335, 337-338.) The A.L.J. did not take any testimony from any other witnesses at the hearing.

In his decision dated April 15, 2004, the A.L.J. found that Plaintiff suffered degenerative disc disease, but her impairment did not meet or equal one of the listed impairments in 20 C.F.R. pt. 404, subpt. P. app. 1 (2003). (Id. at 26). The A.L.J. further found that Plaintiff's allegations regarding her limitations were "exaggerated and self-serving." (Id. at 27.) He concluded that Plaintiff retained the capacity to perform the exertional demands of sedentary work, and that her past relevant work did not require the performance of work functions precluded by her medically determinable impairment. Thus, the A.L.J. concluded that the Plaintiff was not disabled. (Id.)

## STANDARD OF REVIEW

Findings of fact made by the Commissioner of Social Security are conclusive, if they are supported by substantial evidence. Accordingly, judicial review of the Commissioner's decision is limited to determining whether "substantial evidence" supports the decision. Monsour Medical Ctr. v. Heckler, 806 F.2d 1185, 1190 (3d Cir. 1986). In making this determination, a reviewing

13

court may not undertake a <u>de novo</u> review of the Commissioner's decision and may not re-weigh the evidence of record.  <u>Id.</u>  In other words, even if the reviewing court would have decided the case differently, the Commissioner's decision must be affirmed if it is supported by substantial evidence.  <u>Id.</u> at 1190-91.

The term "substantial evidence" is defined as less than a preponderance of the evidence, but more than a mere scintilla of evidence.  As the United States Supreme Court has noted substantial evidence "does not mean a large or significant amount of evidence, but rather such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  <u>Pierce v. Underwood</u>, 487 U.S. 552, 555 (1988).

With regard to the Supreme Court's definition of "substantial evidence," the Court of Appeals for the Third Circuit has further instructed that "[a] single piece of evidence will not satisfy the substantiality test if the [Commissioner] ignores or fails to resolve a conflict created by countervailing evidence.  Nor is evidence substantial if it is overwhelmed by other evidence . . . or if it really constitutes not evidence but mere conclusion."  <u>Kent v. Schweiker</u>, 710 F.2d 110, 114 (3d Cir. 1983).  Thus, the substantial evidence standard embraces a qualitative review of the evidence, and not merely a quantitative approach.  <u>Id.</u>; <u>Smith v. Califano</u>, 637 F.2d 968, 970 (3d Cir. 1981).

14

## DISCUSSION

### I.   Evaluation Of Disability Claims

Within the meaning of social security law, a "disability" is defined as the inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment, which can be expected to result in death, or which has lasted or can be expected to last, for a continuous period of not less than 12 months.  42 U.S.C. §§ 423(d)(1)(A), 1382(c)(a)(3).  To be found disabled, an individual must have a "severe impairment" which precludes the individual from performing previous work or any other "substantial gainful activity which exists in the national economy."  20 C.F.R. § 404.1505.  In order to qualify for disability insurance benefits, the claimant must establish that he or she was disabled prior to the date he or she was last insured.  20 C.F.R. § 404.131, Matullo v. Bowen, 926 F.2d 240, 244 (3d Cir. 1990).  The claimant bears the initial burden of proving disability.  20 C.F.R. §§ 404.1512(a); Podeworthy v. Harris, 745 F.2d 210, 217 (3d Cir. 1984).

In determining whether a person is disabled, the Regulations require the A.L.J. to perform a sequential five-step analysis. 20 C.F.R. §§ 404.1520.  In step one, the A.L.J. must determine whether the claimant is currently engaged in substantial gainful activity.  In step two, the A.L.J. must determine whether the

15

claimant is suffering from a severe impairment.  If the claimant
fails to show that his or her impairment is severe, he or she is
ineligible for benefits.  Plummer v. Apfel, 186 F.3d 422, 427 (3d
Cir. 1999).

If the claimant's impairment is severe, the A.L.J. proceeds
to step three.  In step three, the A.L.J. must compare the
medical evidence of the claimant's impairment with a list of
impairments presumed severe enough to preclude any substantial
gainful work.  Id. at 428.  If the claimant's impairment meets or
equals a listed impairment, the claimant is considered disabled.
If the claimant's impairment does not meet or equal a listed
impairment, the A.L.J.'s analysis proceeds to steps four and
five.  Id.

In step four, the A.L.J. is required to consider whether the
claimant retains the residual functional capacity to perform his
or her past relevant work.  Id.  The claimant bears the burden of
establishing that he or she cannot return to his or her past
relevant work.  Id.

In step five, the A.L.J. must consider whether the claimant
is capable of performing any other available work in the national
economy.  At this stage the burden of production shifts to the
Commissioner, who must show that the claimant is capable of
performing other work if the claimant's disability claim is to be
denied.  Id.  Specifically, the A.L.J. must find that there are

16

other jobs existing in significant numbers in the national economy, which the claimant can perform consistent with the claimant's medical impairments, age, education, past work experience and residual functional capacity.  Id.  In making this determination, the A.L.J. must analyze the cumulative effect of all of the claimant's impairments.  At this step, the A.L.J. often seeks the assistance of a vocational expert.  Id. at 428.

II.   **Whether The A.L.J.'s Decision Is Supported By Substantial Evidence**

By her Motion, Plaintiff contends that the A.L.J.'s decision is not supported by substantial evidence.  Specifically, Plaintiff contends that the A.L.J. erred in (1) failing to evaluate and explain the weight accorded to the opinions of Plaintiff's treating physicians; (2) finding that Plaintiff could perform the full range of sedentary work when the record showed several objective findings, test results, and nonexertional limitations that eroded this residual functional capacity; (3) failing to adequately develop the record regarding the opinions of Plaintiff's treating physicians; (4) mischaracterizing her past relevant work both exertionally and by skill level; (5) engaging in a flawed credibility analysis of Plaintiff; and (6) failing to consider a closed period of disability.

The Court has reviewed the decision of the A.L.J. in light of the parties' arguments and concludes that the A.L.J.'s decision contains legal errors requiring remand.  Specifically,

17

the Court concludes that the A.L.J.'s decision is deficient with regard to its characterization of Plaintiff's past relevant work at step four and its alternative application of the grids at step five.

At step four of the sequential evaluation, the ALJ must determine whether Plaintiff's RFC enables her to perform her past relevant work.  This step requires the A.L.J. to (1) make specific findings of fact regarding Plaintiff's residual functional capacity, (2) make specific findings regarding the physical and mental demands of her past relevant work, and (3) compare the residual functional capacity to the past relevant work to determine whether claimant has the capability to perform her past relevant work.  In this case, the A.L.J. concluded that Plaintiff retained the RFC to perform sedentary work and that her past relevant work fell into the sedentary category; however, the Court concludes that the A.L.J.'s analysis was flawed.

"[R]esidual functional capacity ["RFC"] is defined as that which an individual is still able to do despite the limitations caused by his or her impairment(s)."  Fargnoli v. Massanari, 247 F.3d 34, 41 (3d Cir. 2001).  When determining an individual's RFC at step four of the sequential evaluation, the A.L.J. must consider all relevant evidence including medical records, observations made during medical examinations, descriptions of limitations by the claimant and others, and observations of the

18

claimant's limitations by others.  Id.  Before an individual's
RFC can be expressed in terms of an exertional level of work, the
A.L.J. "must first identify the individual's functional
limitations or restrictions and assess his or her work related
abilities on a function by function basis."  SSR 96-8p.  The RFC
must also address both the exertional and non-exertional
capacities of the individual.  Id.

    With regard to the identification of Plaintiff's functional
limitations and/or restrictions, the Court is troubled by the
A.L.J.'s suggestion that no other physicians imposed work-related
restrictions on Plaintiff, except for Dr. Schwartz, whose opinion
the A.L.J. declined to credit.  A physician's silence regarding a
plaintiff's physical abilities and work restrictions may not be
used as evidence that the plaintiff had no restrictions.  See
e.g., Mason v. Shalala, 994 F.2d 1058, 1068 n.15 (3d Cir. 1993);
Kane v. Heckler, 776 F.2d 1130, 1135 (3d Cir. 1985).  Further, to
the extent that the silence of her physicians suggested a
conflict in the medical evidence, specifically vis-a-vis the
opinions of Dr. Schwartz, the Court concludes that the A.L.J.
should have contacted the treating physicians to clarify and
develop the record.  20 C.F.R. § 404.1512(e)(1); Ventura v.
Shalala, 55 F.3d 900, 902 (3d Cir. 1995).

    With respect to his characterization of Plaintiff's past
relevant work, the A.L.J. is required to consider both the

19

physical and mental demands of the claimant's past jobs.  <u>Burnett</u>
<u>v. Comm. of Soc. Sec. Admin.</u>, 220 F.3d 112, 120 (3d Cir. 2000).
The primary source for determining the skill level, exertional
demands and non-exertional demands of a plaintiff's past work is
the claimant's testimony.  <u>Id.</u> at 124 (citing SSR 82-62).  The
A.L.J. must consider "(1) the individual's statements as to which
past work requirements can no longer be met and the reason(s) for
his or her inability to meet those requirements; (2) medical
evidence establishing how the impairment limits ability to meet
the physical and mental requirements of the work; and (3) in some
cases, supplementary or corroborative information from other
sources such as employers, the Dictionary of Occupational Titles,
etc., on the requirements of the work as generally performed in
the economy."  <u>Id.</u>  A determination regarding past relevant work
that is contrary to uncontroverted evidence presented by the
plaintiff is clear error.  <u>Id.</u>

In this case, Plaintiff testified regarding the exertional
demands of her past work as follows:

Q:   What type of place was the Foundation?

A:   A foster care agency.

Q:   How many children were you responsible for?

A:   Approximately twenty-two.

Q:   From what age?

A:   Birth to seventeen years old.

Q:    Okay.  Give me a complete physical job description, in detail of what you did at The Foundation.

A:    Lifting children, moving luggage, moving boxes, driving --

Q:    How many hours a day would dr -- you have to be required to drive at that job?

A:    Six or more.

Q:    Okay.  Did that job require you to lift?

A:    Yes sir.

Q:    About how many hours a day?

A:    Four or more.

Q:    Okay and what was the average weight you had to lift?

A:    Twenty-five pounds or more.

Q:    What would you have to lift?

A:    Children, luggage, boxes.

Q:    How many hours a day would you be required to stand?

A:    Five or more.

Q:    Okay, how about climbing?

A:    Four or more.

Q:    What would you have to climb?

A:    Steps.

Q:    How many steps did you have to climb there everyday?

A:    Approximately ten.

Q:    Okay, how many hours a day would you sit there?

21

```
A:    Two or more.

Q:    How 'bout bending?

A:    Four or more.

Q:    How 'bout pushing and pulling?

A:    Four or more.

Q:    How 'bout walking?

A:    Two or more.
```

Plaintiff also described her previous job in the following terms:

```
Q:    Where did you work before that?

A:    Maternity Care Coalition.

Q:    What type of place is that?

A:    It's a social service agency.

      * * *

Q:    And what was your job title.

A:    Social worker.

Q:    How many people were you responsible for?

A:    Twenty-four, approximately.

Q:    And what ages were they?

A:    Fourteen to eighteen years old.

Q:    And who would you be a counselor for?

A:    Pregnant and parenting teens.

Q:    What was your complete in detail job description?

A:    Moving children, lifting small children, lifting
```

children, moving items, moving luggage.

Q:    Would you have to do driving?

A.    Yes, sir.

Q:    How many hours a day or more?

A:    Six or more.

Q:    How about lifting, how many hours a day?

A:    Four or more.

Q:    Okay, and what would be the average weight you would have to lift?

A:    Twenty-five pounds or more.

Q:    What would you have to lift?

A:    Children, boxes, luggage.

Q:    How many hours a day would you stand?

A:    Two or more.

Q:    How about climbing?

A:    Four or more.

Q:    What would you have to climb?

A:    A series of steps.

Q:    How many steps?

A:    Approximately 60 or 70.  I was on the fourth floor with no elevator.

Q:    So there's no elevator?

A:    No.

Q:    How many hours a day would you sit?

23

A:   Two or more.

Q:   How about bending?

A:   Two or more.

Q:   How about pushing and pulling?

A:   Three or more.

Q:   How about walking?

A:   Two or more.

In discussing her past relevant work, the A.L.J. did not discuss Plaintiff's testimony, but instead characterized her past relevant work as "case manager-social work (DOT 054.067-010)" which is "rated as a sedentary, skilled occupation." (Tr. 25.) However, the DOT listing cited by the A.L.J. appears to be more of a research position, which is completely at odds with Plaintiff's testimony concerning her past positions. In relevant part, DOT 054.067-010 provides:

> Plans, organizes, and conducts research for use in understanding social problems and for planning and carrying out social welfare programs: Develops research designs on basis of existing knowledge and evolving theory. Constructs and tests methods of data collection. Collects information and makes judgments through observation, interview, and review of documents. Analyzes and evaluates data. Writes reports containing descriptive, analytical, and evaluative content. Interprets methods employed and findings to individuals within agency and community. May direct work of statistical clerks, statisticians, and others. May collaborate with research workers in other disciplines. May be employed in voluntary or governmental social welfare agencies, community welfare councils, and schools of social work.

24

Defendant contends that the A.L.J.'s incorrect DOT citation
is harmless error, because other jobs listed in the DOT
correspond more closely to Plaintiff's work.  Specifically,
Defendant directs the Court to DOT 195.107-010 and 195.107-018,
both of which require no more than sedentary exertion.  However,
this Court is required to review an agency determination on the
grounds invoked by the agency.  <u>S.E.C. v. Chenery Corp.</u>, 332 U.S.
194, 196 (1947).  Further, the Court is reluctant to supplement
the A.L.J.'s specifically identified DOT listing with the listing
advanced by Defendant, where as here, the Court has reviewed the
DOT and finds other listings which appear to be compatible with
Plaintiff's description of her past relevant work, and those
listings are classified as requiring light exertional work.  <u>See
e.g.</u>, DOT 195.107-014 Caseworker, Child Welfare.

In the alternative, the A.L.J. proceeded to step five of the
sequential analysis and applied Grid Rule 201.29 to conclude that
Plaintiff was not disabled.  However, the Court likewise
concludes that the A.L.J.'s step five analysis was flawed, and
therefore, it cannot provide a basis upon which to affirm the
A.L.J.'s decision.  Grid Rule 201.29 assumes the transferability
of skills to a full range of sedentary work and application of
this Rule requires the A.L.J. to make specific findings regarding
the skills at issue and their transferability to specific
occupations.  SSR 82-41.  The A.L.J. omitted this analysis and

did not take the testimony of a vocational expert on the skill level required for Plaintiff's past relevant work and the jobs to which such skills could be transferred.

In light of these errors, the Court cannot conclude that the A.L.J.'s decision is supported by substantial evidence. Accordingly, the Court will reverse the decision of the Commissioner and remand this matter for further findings and/or proceedings consistent with this Memorandum Opinion.

## CONCLUSION

For the reasons discussed, the Court will deny Defendant's Motion For Summary Judgment and grant Plaintiff's Motion For Summary Judgment. The decision of the Commissioner dated April 15, 2004, will be reversed and this matter will be remanded to the Commissioner for further findings and/or proceedings consistent with this Memorandum Opinion.

An appropriate Order will be entered.